Hay, J.
Plaintiff in his petition alleges, in substance, that he is now and since April, 1917, has been conducting a general mercantile business in 'the city of Defiance, Ohio; that the defendants, Whitaker, Shermair and Vandenbroek are competing merchants in sa¿d city; that the Crescent Printing Company is an Ohio corporation publishing a daily and a weekly newspaper in said city.
That said three competing merchants in April, 1917, conspired aiid have ever since conspired together to prevent and by threats, boereion and persuasion have prevented said Printing Company from receiving and publishing the business advertisements of *226 plaintiff, to the great and irreparable injury of said Fred "W. Uhlman.
Plaintiff prays that said competing merchants be enjoined from so persuading, coercing or intimidating said printing company and that a mandatory injunction be issued restraining said company from refusing to accept from plaintiff proper and legal advertisements of his said ¡business.
Said three competing merchants file answers denying any such conduct or conspiracy on their part, but said .Crescent Pi’inting Company has, as yet, filed no answer.
This cause ivas heard and submitted on a motion by plaintiff for the allowance of a temporary restraining order against said Whitaker, Sherman and Vandenbroek and the issuance of the mandatory injunction asked for against said printing company.
As to conspiracy branch of the ease we find that there is no evidence substantiating the charges made in the petition against the three competing merchants, or either or any of them. Suffice to say that each one of them in his testimony emphatically denies any conspiracy, coercion, threats or intimidation, and Mr. Tustison, the manager of the printing company, corroborates their testimony. Both Mr. Whitaker and Mr. Sherman gave their reasons why they considered some of the business methods of plaintiff unfair to the general public and competing merchants. Mr. Sherman expressed his views to Mr. Tustison, but made no threats of any withdrawal of patronage. The action of the manager of the printing company in this matter seems to have been voluntary and based on what he considered the best interest of his company. f
The other branch of the case introduces a noveLquestion: can plaintiff compel this printing company to-'-'accept and publish his business “ads” on payment of the ordinary and regularirates therefor? In other words, under the circumstances shown by the evidence, has this court the power to issue the mandatory injunction asked for? Learned and diligent counsel on both sides were unable to find a parallel case. We have also been unable to find one. Therefore in assisting to establish such *227 precedent as may be established in this case, we must try to ascertain what are the respective rights of the plaintiff and this newspaper company under the laws of Ohio.
That the printing company is a corporation cuts little figure. Private individuals could conduct these two newspapers without the aid of any articles of incorporation. Its charter from the state confers upon it no extraordinary rights or privileges, not common to any private corporation. The main objects of incorporating were probably perpetuity and limitation of liability.
Ordinarily, persons can not be forced into contracts. There is absolute freedom on the part of each party negotiating to accept or reject the offer made by the other.
The Supreme Court of Ohio, In Re Steube, 91 O. S., 139, quotes Sec. 1, Art. 1 of the Constitution of Ohio, and then says:
“The right to contract is recognized as a property right essential to the acquisition, possession and protection of property.”
Why, if at all, can the publisher of a newspaper be compelled to become a party to a contract not to his or its liking?
The carefully prepared brief of counsel for plaintiff was evidently designed to meet the other branch of the case, and this branch was not discussed,- However, in argument, counsel claimed the printing company stood in the same position as a proprietor of an inn.- or theater, and also that it was a quasi public corporation And the moment it sold any of its advertising space to merchants competing with plaintiff, it immediately became bouftd to accept plaintiff’s “ads.”
We will consider these two claims separately.
Firs^. Does the publisher of a newspaper stand exactly in §ame relation to the general public as the keeper of a hotel or ti(e manager of a place of amusement? We think not.
Action 12940 of the General Code of Ohio under the chapter Plaining to “Violation of Personal Rights” provides as folWs;
*228 .“Section 12940. Whoever,• being the proprietor or his employee, keeper or manager of an inn, restaurant, eating house, barber shop, public conveyance by land or water, theater or other place of public accomodation and amusement, denies to a citizen, except for reasons applicable alike to all citizens and regardless of color or race, the full enjoyment of the accomodations, advantages, facilities, or privileges thereof, or, being a person who aids or incites the denial thereof, shall be fined not less than fifty dollars nor more than five hundred dollars or imprisoned not less than thirty days nor more than ninety days, or both.”
Section 12941 reads as follows:
“Section 12941. Whoever violates the next preceding section shall also pay not less than fifty dollars nor more than five hundred dollars to the person aggrieved thereby to foe recovered in any court of competent jurisdiction in the county where such offense is committed.”
These statutes providing penalties for the violation of the civil rights of citizens do not include or affect a newspaper publisher.
We come now to iho second contention that the Crescent Publishing Company is a quasi public corporation and by virtue of the fact that it sells advertising space to one or more in a certain class that it must also sell such space to others of that class if they desire it.
This claim is founded on the theory that- the defendant printing company is so “affected with a public Interest ” that it is a quasi public corporation.
Section 570 of Elliott on Contracts treats of such corporations as follows:
" There is a class of corporation so affected with a public interest' that they are often called quasi public corporations, although they private corporation rather than are gas and water companies, telegraph and telephone compafiies, *229 heating companies and the like. The general principles of the law of contracts already considered, apply in the main where such corporations are parties as well as other cases; but there are some distinctions and some peculiar applications of the rules to their contracts, which are more subject to legislative control, in some respects, than those of ordinary strictly private corporations; and they have public duties to perform that may limit the power to contract, or even require them to contract, in effect at least, in certain instances.”
In Section 571 the author further says:
‘ ‘ In general, a corporation affected with a public interest has all the attributes and incidents of a private corporation, and as a general rule is accorded the same measure of legal constitutional protection for itself and its members as is given a private corporation. But contracts entered into by a qxiasi public corporation, in the discharge of its public duty, may differ fundamentally from the ordinary contract and the rules which govern it. The relation between a public service corporation and its patrons is consensual. But there is this difference; the corporation must accept the application of the would-be patron, if it is one he is entitled to make and if he complies with the reasonable rules of the company.”
We can readily see why this rule applies to a railroad company, a gas or water company, a light or heating' company, or a telegraph or telephone company, or any common carrier or other corporations receiving from the state the right of eminent domain, or other valuable rights or privileges.
In some cases, however, it is difficult to decide whether or not a business has become clothed with a public interest so that its patrons should not be discriminated against.
In the mass of litigation concerning such claims it has been held that public wharves, grain warehouses, grist mills, fire insurance, stock yard companies, grain elevators, hack lines, theaters’ and other public places of amusements are kinds of business affected with a public interest.
In the case of McCarter, Atty. Gen., v. Firemans Insurance Company et al, a New Jersey case, reported in the 73rd Atlantic *230 Reporter, page 80, the court attempts to define, as nearly as possible just when a business 'becomes clothed or affected with a public interest.
Whether the business of fire insurance is a business affected with a public interest, the court say:
“The answer to this question does not depend, as counsel for the respondents argue, upon whether the defendants were expressly created as public agents, or whether the state has expressly charged them with the performance of a public duty, or has to that end clothed them with monopolistic privileges or granted to them its right of eminent domain, or required that they insure the property of citizens alike. These are indicia by which the existence of ‘a pulblic interest’ may be readily discerned, but, so far from,‘the public interest’ arising out of these incidents, the fundamental fact is, that they arose out of such public interest. In natural course the public interest first arose, and afterwards, and because of such interest, all of these incidents were added unto it. In their inception all public callings were private ones, whose history has consisted in the evolution of a public character and of the incidents that they now possess. ‘ First the blade, then the ear, after that the full corn in the ear. ’
“Such at the common law was the course by which common carriers, and all of the callings now recognized as affected with a public interest, ceased to be juris privati only, and became matters of public concern. More than two centuries ago Lord Chief Justice 'Hale said that when private property is affected •with a public interest, it ceases to be juris privati only, and illustrated this by the ease of a man who sets up a crane in his yard that in due course ceases to be juris privati and becomes subject to public regulations. This statement of Lord Hale was cited with approval and applied iby Lord Kenyon a century later ‘and has’ said Chief Justice Waite speaking for the Supreme Court of the United States ‘still a hundred years later, been accepted without objection as the law of property ever since.’ Munn v. Illinois, 94 U. S., 113. ‘Property,’ Chief Justice Waite continues, ‘does become clothed with a public interest, when used in a manner to make it of public consequence and affect the community at large. ’ When therefore, one devotes his property to a use in which the public has an interest, he in effect grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created.”
*231 The court goes on to speak of the business of fire insurance, its growth and regulations and says:
“It seems to me that it is impossible to say that by its very growth and success, the business of fire insurance has not become affected with a public interest within the principle of Munn v. Illinois. That it is deemed for legislative purposes to be. so affected, is evident from the voluminous code created in this state for its regulation in the interest of the public.” ******
“The conclusion we reach from these considerations is that the.business of the defendants is in point of fact one that directly affects the interest of the public, and that such public interest has been recognized as a subsisting one by the Legislature of this State, and that in point of law the business of the defendants is affected with a public interest.”

******

“Upon the underlying proposition that a business, private at its inception, may become affected with a public interest, it is immaterial that the question of its public character arose in a case where its restraint had been legislatively rather than judicially determined. Upon this point, Munn v. Illinois, as was said by Chief Justice Waite, introduced no novel departure. What it did was to call attention to the fundamental relations that existed between the use of private property and the creation of a public interest in such use, and its chief value as a contribution to jurisprudence was that it pointed out clearly, that in the determination of such a relation, the underlying question was not what the state had done to impress a public interest upon a business, but*what the owners and operators of such business had done to draw to, and thus clothe themselves with a public interest; for in Munn v. Illinois, the state had done absolutely nothing. The vast importance of the maintenance of this point of view by the courts of the country must be conceded when we consider that to an unprecedented extent business enterprises are launched the success of which depends upon the extent to which the public can be attracted to them and constrained to lean upon them. Public support of this character is essential to the success of these enterprises, and hence is from their inception the desideratum of their promoters. When, ■therefore, success along these lines has been attained, it brings with it duties to the public, whose interests are involved, of precisely the same nature as if such duties had been imposed by *232 public law upon such enterprises at their inception. This was the principle that was recognized and applied in Munn v. Illinois, and if it be sound as applied to individuals, it must a fortiori be sound as regards corporations. ’ ’
Now to apply these principles to the instant case. Newspapers in this country have become universal. They are now practically in every home. They give to the people daily the news from all quarters of the globe. They gather and publish the many items of local news so much desired by the people of the particular locality in which they arc printed. They publish the weather reports, the market reports and the hundred and one other things which the people desire to read and know. They are favored by the law with the publishing at a liberal price of sheriff’s sales, financial reports of city and county offiC cers, sales of county and municipal bonds, notices of the reception of bids for public contracts, rates of taxation, appointment of executors and administrators and many other public notices of various kinds.
These all add to the interests of the public in the business and serve to make it a success, and cause the public to depend upon the newspapers not only for knowledge of current events, both local and foreign, but also for a knowledge of these matters of public concern which vitally affect every citizen and taxpayer.
The General Assembly of Ohio has parsed scores of statutes requiring notices of various kinds to be published in newspapers of the state. It has defined a square. (See Section 6254, G. C.) It has fixed a maximum rate to be charged for such printing. -We think courts must take judicial notice of the many public favors which have thus been extended to the newspapers of the state. While the legislation usually requires such notices to be published and it would seem to be mandatory upon newspaper publishers to publish such notices, yet Section 10221 of the General Code provides: I
“When it is provided by statute that a notice shall be pub-, lished in a newspaper, and no such newspaper is published in *233 the county or other place mentioned, or, if it is published there, and on tendering of his usual charge for a similar notice the publisher refuses to insert it in his newspaper, then a publication in a newspaper of general circulation in the county or other place mentioned shall be sufficient.”
This section of the code provides in case of a refusal by the home paper to publish a public notice that such notice may be published in some other newspaper of general circulation in' the county or municipality where such notice should be published. No provision is made, however, for such a case as would arise if all newspapers having a general circulation in such county or place should refuse to publish such “ads.”
While the General Assembly by its generous provisions for the payment of such published “ads,” evidently has had little fear of any refusal on the part of all newspaper publishers, coming within the category required, yet while such a general refusal is not probable, it is not impossible.
While our Legislature has not gone so far as to say that such notice shall be published by newspapers printed within the localities where such notices are required to be published, and to impose a penalty for any refusal on their part to so publish them, yet we hardly think any lawyer will contend that such newspapers could not be required to publish such notices, providing the fees fixed therefor were reasonable.
We believe that the growth and extent of the newspaper business, the public favors and general patronage received by the publishers from the public, and the general dependence, interest and concern of the public in their home papers, has clothed this particular business with a public interest and rendered them amenable to reasonable regulations and demands of the public.
If we are right in this conclusion, and the proper authorities in the county and municipal corporations could enforce without further legislation, the publication of notices required by statute, in case of a unanimous refusal, what is the status of a local merchant whose advertisements are refused when the “ads” of other merchants in the same class are received?
*234 Our Legislature has spoken in reference to inns, barber shops, hack lines, theaters and other places of public accommodation, but it has not yet spoken as to the newspaper business. The highest courts in the land say, however, that if the particular business in question has assumed such proportions and importance in a state or locality that under the well-established rule it has become affected with a public interest, then the rights of the public in dealing with such corporations may be enforced in court, even though the legislative department of the state has not yet gone that far in seeking to regulate such business.
Is it reasonable to say that warehouses, public wharves, hack lines, ferries and many kindred lines of business are of more concern and importance to the public than the newspaper business?
We are of the opinion that it will be difficult to find any one line of business in the present age of the world which is of more vital interest and concern to the general public than the newspaper business. It is a moulder of public opinion, the general medium by which local and foreign news is conveyed to its patrons, the vehicle which carries to the people of the locality in which it is circulated, the most vital facts concerning its governmental matters.
It is the best advertising medium for local merchants. By general custom, the merchant speaks through it to his patrons, and the purchasing public uses it as a medium to select its places of purchase.
We therefore believe that a newspaper company when it has advertising space to sell has no right to discriminate against a local merchant who in his application for advertising complies with the law and the reasonable rules of said newspaper company in reference to the character of his advertisement, and tenders the regular and ordinary fee charged therefor by said paper.
We do not intend to hold that a newspaper company may not reject some class or classes of advertising entirely, or that it may not use reasonable discretion in determining whether or not an advertisement presented is a proper one. We believe *235 that a newspaper company may determine how much of its space it will sell for advertising purposes and how much it will 'devote to reading matter; that when its advertising space is sold, it would not be any discrimination to refuse further applications for space. We are of the opinion, however, that the rules should be reasonable and applicable to all persons in the same class.
In this case, if it is the rule of the defendant printing company not to accept from any merchant advertisements of sales of the so-called bankrupt class of merchandise, then it would be no discrimination against the plaintiff to refuse to receive that character of an advertisement from him. We hold, however, that whenever the defendant printing company has advertising space to sell and the plaintiff in his application for advertising space complies with the law and the reasonable rules of the said company as to the kind and character of the advertisement offered, and tenders the regular and ordinary fee therefor, that the printing company is bound to accept it.
We think perhaps that the mandatory injunction prayed for might be allowed on a motion for a temporary order in some eases where serious damage would occur to the applicant if the issuance, of the mandatory injunction was delayed until the hearing of the case on its merits. We do not think any such ease of damages was shown on this hearing as necessitates the ■issuance of a mandatory injunction as prayed for in the petition at this time, but we have gone into the case fully so that counsel may have the benefit of our views in the final hearing of the ease upon its mérits.
The temporary restraining order against the three merchants ■will be refused and the mandatory injunction asked for against the printing company will be denied at this time.
The defendant printing company, if it desires, may have leave to answer by the first Saturday of February.
An entry may be drafted accordingly.